Filed 11/17/25

CERTIFIED FOR PUBLICATION
COURT OF APPEAL -- STATE OF CALIFORNIA
FOURTH DISTRICT
DIVISION TWO

## ORDER

| | |
|---|---|
| MARK KEVIN SCHLICHTER, | E083744 |
| Plaintiff and Respondent, | |
| v. | (Super.Ct.No. TRUPS2000158) |
| GARY KENNEDY, | |
| Defendant and Appellant. | The County of San Bernardino |

_____

THE COURT

We issued an order to show cause why attorney Jeffrey Dean Grotke (State Bar No. 231454) should not be sanctioned for "relying on fabricated legal authority." (*Noland v. Land of the Free, L.P.* (2025) 114 Cal.App.5th 426, 445 (*Noland*); Code Civ. Proc., § 128.7, subds. (b)-(c); Cal. Rules of Court, rules 8.204(a)(1)(B), 8.276(a)(4); unlabeled rule references are to the California Rules of Court.)  Grotke filed a written response to the order to show cause and also appeared at a hearing on the order, but he has failed to show cause why sanctions should not be imposed.

I.      *Background*

A.      *The spurious case citations*

On May 29, 2024, Grotke filed a petition for writ of supersedeas (hereafter Writ) on behalf of the appellant in case No. E083744, *Schlichter v. Kennedy*.  The petition was summarily denied.  On January 9, 2025, Grotke filed the appellant's opening brief (hereafter AOB) in the same case.

The Writ included the following citations to cases that do not exist:  (1) *Estate of Layton* (1938) 29 Cal.App.2d 599 (Writ p. 40), (2) *Riddle v. Harmon* (1865) 5 Cal. 491 (Writ p. 42), and (3) *Estate of Kraus* (1970) 8 Cal.App.3d 429 (Writ p. 30).  The AOB also included citations to cases that do not exist:  (1) *Estate of Kraus* (1970) 8 Cal.App.3d 429 (AOB p. 16) and (2) *Estate of Hermon* (1973) 16 Cal.App.3d 421 (AOB p. 31).  The volume and page number citations all lead to cases with names that are different from those provided by Grotke:  (1) *Roy v. Roy* (1938) 29 Cal.App.2d 596, (2) *Jamson v. Quivey* (1855) 5 Cal. 490, (3) *Liberty Mut. Ins. Co. v. Colonial Ins. Co.* (1970) 8 Cal.App.3d 427, and (4) *Atkins v. Bisigier* (1971) 16 Cal.App.3d 414.  And the cited pages do not support the legal propositions for which Grotke cited them.  Grotke did not cite any other legal authority to support any of the propositions for which he cited the nonexistent cases.  (Writ pp. 30, 40, 42; AOB p. 16.)

1

Cases with the case names provided by Grotke do exist, but the volume and page number citations for the actually existing cases are different from the volume and page number citations provided by Grotke:  (1) *Estate of Layton* (1996) 44 Cal.App.4th 1337 or *Estate of Layton* (1933) 217 Cal. 451, (2) *Riddle v. Harmon* (1980) 102 Cal.App.3d 524, (3) *Estate of Kraus* (2010) 184 Cal.App.4th 103, and (4) *Estate of Hermon* (1995) 39 Cal.App.4th 1525.  And the actually existing cases with those names do not support the legal propositions for which Grotke cited nonexistent cases with those names.

On September 19, 2025, we provided the parties with a tentative opinion and gave them 12 days to request oral argument.  On the same day, we issued an order directing Grotke to provide us with copies, from an official reporter, of the following four cases, and we identified the pages on which each case was cited in the Writ or the AOB:  (1) *Estate of Layton* (1938) 29 Cal.App.2d 599 (Writ p. 40), (2) *Riddle v. Harmon* (1865) 5 Cal. 491 (Writ p. 42), (3) *Estate of Kraus* (1970) 8 Cal.App.3d 429 (Writ p. 30), and (4) *Estate of Hermon* (1973) 16 Cal.App.3d 421 (AOB p. 31).  We gave Grotke five days to respond.  On the sixth day, Grotke provided the court with copies of the actually existing cases with those case names:  (1) *Estate of Layton* (1933) 217 Cal. 451, (2) *Riddle v. Harmon* (1980) 102 Cal.App.3d 524, (3) *Estate of Kraus* (2010) 184 Cal.App.4th 103, and (4) *Estate of Hermon* (1995) 39 Cal.App.4th 1525.  Grotke did not explain why the volume and page number citations for the cases that he provided were different from the volume and page number citations in the Writ, the AOB, and our order.

B.      *The order to show cause and response*

Neither party filed a timely request for oral argument in the appeal, so the cause was submitted on October 3, 2025.  On October 16, 2025, we issued the order to show cause.  Among other authorities, we cited rule 8.204(a)(1)(B), which provides that each point in every brief must be supported "by argument and, if possible, by citation of authority."  We notified Grotke of the problems with the four spurious case citations:  His volume and page number citations lead to cases with different names from the ones he provided; the pages cited do not support the legal propositions for which he cited them; and the actually existing cases with the case names he provided also do not support the legal propositions for which he provided the spurious citations.  We further notified him that the four spurious citations appear to have been fabricated by artificial intelligence (AI)—"'what has become known as AI "hallucinations."'" (*Noland*, *supra*, 114 Cal.App.5th at p. 443.)

In response to the order to show cause, Grotke filed a declaration that he signed under penalty of perjury.  (Grotke Decl. p. 7.)  Grotke admitted:  "[F]our authorities cited in [his] appellate briefing were mis-cited at the reporter/volume/page level.  I accept responsibility for this error.  It was not willful.  It resulted from a breakdown in my citation-verification process during compilation from vLex (vlex.com)."  (Grotke Decl. ¶ 2.)  But he also said that *after* he received our September 19, 2025, order directing him to provide copies of the four cases, he "created a temporary membership with vLex (vlex.com), retrieved, and reviewed the decisions that appeared—by party name—to correspond to those authorities."  (Grotke Decl. ¶ 4.)

Grotke further attested:  "I did not fabricate opinions, quotations, or pin citations.  The authorities I intended to rely upon are real published California decisions.  My error was in providing reporter citations that, at the volume/page listed, resolved to different opinions than the ones I intended."  (Grotke Decl. ¶ 3.)  As to "[w]hy the four citations ended up incorrect," Grotke stated:  "I cannot identify a single, specific cause for each mismatch."  (Grotke Decl. ¶ 8, boldface omitted.)

Grotke attested that "the core allegation as to using 'AI hallucination' cases is entirely untrue."  (Grotke Decl. ¶ 18.)  He asserted that "none of these cases was the product of an AI hallucination, and these errors are entirely clerical in nature."  (Grotke Decl. ¶ 9.)  Grotke "accept[ed] responsibility for ensuring that the reporter citations and pinpoints are accurate at filing" and "sincerely apologize[d] to the Court for the inconvenience and concern caused by [his] citation errors."  (Grotke Decl. ¶¶ 8, 14.)

Grotke claimed that the four cases that he provided to this court in response to our order of September 19, 2025, were the cases that he "intended to rely upon" in the Writ and the AOB.  (Grotke Decl. ¶¶ 3, 9.)  He further provided a "case breakdown" for each of the four cases, in which he purported to identify the legal propositions for which he intended to cite those cases.  (Grotke Decl. ¶ 9.)

In the Writ, Grotke cited the nonexistent *Estate of Layton* case for the following proposition:  "In *Estate of Layton* (1938) 29 Cal.App.2d 599, 601:  The court noted that a life tenant has the right to use and enjoy the property, emphasizing that such rights are typically subject to reasonable use without committing waste."  (Writ pp. 40-41.)  The actually existing case with that name, *Estate of Layton* (1933) 217 Cal. 451, does not support that proposition and does not contain the terms "life tenant," "life estate," "reasonable," or "waste."  (*Id.* at pp. 452-467.)  The actual case is not about a life estate or the rights of a life tenant.  (*Ibid.*)

In the "case breakdown" in his declaration, Grotke claimed that he cited *Estate of Layton* for entirely different propositions about trusts, heirs, and interested persons.  (Grotke Decl. ¶ 9.)  That is incorrect.  The sole proposition for which he cited *Estate of Layton* is the proposition concerning life tenants, reasonable use, and waste, quoted above.

In the Writ, Grotke cited the nonexistent case *Riddle v. Harmon* (1865) 5 Cal. 491, 494 as "recogniz[ing] the distinction between the use of property under a life estate and the absolute ownership of cash assets."  (Writ p. 42.)  The actually existing case with that name, *Riddle v. Harmon* (1980) 102 Cal.App.3d 524, is about how to terminate a joint tenancy in real property (*id.* at pp. 526, 531) and has nothing to do with a distinction between life estates and cash assets (*id.* at pp. 526-531).

In the "case breakdown" in his declaration, Grotke claimed that he cited *Riddle v. Harmon* for entirely different propositions concerning the "'recorded act controls' principle" and "giving legal effect to the deed as executed and recorded."  (Grotke Decl. ¶ 9.)  That is incorrect.  The sole proposition for which he cited *Riddle v. Harmon* is the proposition about life estates and cash assets, quoted above.

3

In both the Writ and the AOB, Grotke cited the nonexistent *Estate of Kraus* (1970) 8 Cal.App.3d 429 for the proposition "that assets not specifically included in the pleadings fall outside the court's jurisdiction unless appropriately added through amendments." (Writ p. 30; AOB p. 16.) The actually existing case with that name, *Estate of Kraus* (2010) 184 Cal.App.4th 103, does not involve a probate court lacking jurisdiction over assets because they were not included in a pleading. (*Id.* at pp. 110-118.)

In the "case breakdown" in his declaration, Grotke claimed that he intended to cite *Estate of Kraus* for an entirely different proposition about the "property-recovery framework" in Probate Code sections 850 and 859. (Grotke Decl. ¶ 9.) That is incorrect. The sole proposition for which Grotke cited *Estate of Kraus* is the proposition concerning lack of jurisdiction over assets not included in the pleadings, quoted above.

In the AOB, Grotke cited the nonexistent *Estate of Hermon* (1973) 16 Cal.App.3d 421 for the proposition that "courts are obligated to construe testamentary terms in light of equitable considerations, especially where long-standing, marriage-like relationships exist." (AOB p. 31.) The actually existing case, *Estate of Hermon* (1995) 39 Cal.App.4th 1525, 1527, involved construction of a will in which bequests were made to the decedent's spouse before the couple divorced. The court did not construe the will in light of equitable considerations but rather analyzed the issue under applicable provisions of the Probate Code. (*Estate of Hermon*, 39 Cal.App.4th at pp. 1529-1532.) The terms "equity" and "equitable" do not appear in the opinion.

In the "case breakdown" in his declaration, Grotke claimed that the actually existing case, *Estate of Hermon* (1995) 39 Cal.App.4th 1525, supports the proposition for which he cited *Estate of Hermon*, in that "the equitable considerations that were considered were the fact the decedent had been divorced." (Grotke Decl. ¶ 9.) That is incorrect. The actually existing case says nothing about equitable considerations.

Finally, in his declaration, Grotke requested that we sanction him $500 payable to the court, discharge the order to show cause, and take the matter off calendar. (Grotke Decl. ¶ 19.) He described how he intended "[t]o prevent recurrence," attesting that he had "implemented a robust verification protocol." (Grotke Decl. ¶¶ 10, 18 & Exh. A.) We denied the request to discharge the order to show cause and ordered Grotke to appear at the hearing.

C.      *The hearing*

The hearing on the order to show cause was held on November 4, 2025. At the hearing, Grotke stated that he was solely responsible for preparing the written filings. (49:20-49:33)

Grotke admitted that he used AI in preparing the AOB. (36:21-36:46; 36:51-36:55; 40:57-41:08; 58:08-58:11) He explained that after the writ petition was denied, he "took the brief that [he] had and [he] had it regenerated using AI," believing that AI might better organize it. (36:21-36:46; 40:57-41:08)

4

As to the Writ, Grotke initially stated: "The writ was not generated by any use of AI whatsoever. It was, uh—if there were any mistakes in that, they were just mistakes." (28:22-28:39) Upon being questioned about the citation to *Riddle v. Harmon* in the Writ (32:55-34:13), Grotke later said that he could not recall whether he used AI to assist him with that particular case citation in the Writ. (37:40-38:34; 39:59-40:07) But he admitted that it was "possible." (38:35-38:45) He explained that he could not recall because the Writ was filed more than one year ago (38:10-38:34; 40:50-40:56), so it was "hard for me to go back and reconstruct that." (47:17-47:20)

Despite his admissions concerning his use of AI, Grotke said that he did not know how the four spurious citations got included in his briefs. (29:13-29:31; 29:59-30:03; 43:00-43:03) He said, "If I knew how it happened, it would not have happened." (29:29-29:31) Grotke provided the following possible explanations of how the citations appeared in his briefs: (1) "in editing when you're going back and forth and you're dealing with multiple issues" (29:34-29:47; 1:00:38-1:00:39); (2) "you're under a time constraint" (29:50-29:52; 1:00:19-1:00:38); (3) "sometimes when you're using the same brief template that you used for [a] previous appeal, sometimes they get mixed up" (32:24-32:34); (4) "it's either a clerical mistake or . . . there was something that didn't get saved" (42:47-42:57); (5) "maybe there was a line moved up or down"(42:57-43:00); (6) "what may have happened is the text might have been jumbled so that where [*Estate of Layton*] should have been cited it wasn't cited" (47:07-47:15); and (7) "in reorganizing, it jumbled." (47:30-47:33) Grotke explained that by "clerical error" he means "that even if I did find it with AI I didn't check it correctly or I did or I thought I checked it and it wasn't, it wasn't, it wasn't right." (39:32-39:52) Asked whether a citation to a California Supreme Court case from the year 1865 (the spurious citation for *Riddle v. Harmon*) piqued his curiosity, Grotke replied: "I mean I should probably use glasses. You know, I'm moving towards that. And it's hard for me to look at these numbers. Sometimes with 1865 you might just think it's a page, you know." (47:35-48:12)

Grotke asserted that it was his practice to check the citations for "all of" the cases that he finds by using AI. (41:36-42:15; 42:36-42:47; 1:04:16-1:04:35)

Grotke claimed that the cases that he provided to this court in response to our order of September 19, 2025, were "the case[s] that were intended to be cited." (1:12:20-1:12:25) He said that when he tried to find the cases using the citations in our order (which were identical to the citations in his briefs), he discovered that the cited cases do not exist. (1:08:25-1:08:52; 1:10:44-1:10:58) He assumed that because the citations in our order were wrong, he "need[ed] to find the correct case[s]." (1:12:40-1:12:53)

When asked whether he had a vLex membership before he received our order of September 19, 2025, Grotke answered that he had not previously had any type of membership with vLex. (44:40-45:34) Grotke explained that he uses "several sites" and he "may have used it on and off, here and there but [he] never signed up for it." (45:13-45:19)

Grotke apologized to the court for the "mistakes" that he made and took full responsibility for the mistakes "whether or not they were AI or not." (48:29-48:32;

1:00:01-1:00:21; 1:03:16-1:03:19)  He said that he was not at the hearing to "misrepresent anything to the court." (56:15-56:20)  As to mitigation, Grotke told the court that in the future he will check citations "very carefully" to ensure that "the numbers and the names match and the propositions match." (1:04:00-1:04:16)

II.      *Legal framework*

Like all California attorneys, Grotke is obligated to comply with the California Rules of Court. (*People v. Alvarez* (2025) 114 Cal.App.5th 1115, 1118 (*Alvarez*).)  Rule 8.204(a)(1)(B) provides that each point in every brief must be supported "by argument and, if possible, by citation of authority."  We are authorized to sanction an attorney for committing any "unreasonable violation" of the rules. (Rule 8.276(a)(4); *Noland*, *supra*, 114 Cal.App.5th at pp. 442-443 [compiling case authority for sanctions imposed by appellate courts for rule violations].)

In *Noland*, the Second Appellate District addressed an attorney's use of generative AI to fabricate legal citations that he included in his appellate briefs without verification. (*Noland*, *supra*, 114 Cal.App.5th at pp. 441, 443.)  In response to the court's order to show cause, the attorney in *Noland* acknowledged that his briefs were "replete with fabricated legal authority, which he admit[ted] resulted from his reliance on generative AI sources" (*id.* at p. 443), which "he did not 'manually verify'" (*id.* at p. 441).  *Noland* concluded that the attorney's conduct was sanctionable on the grounds that it rendered the appeal frivolous and that "[t]he appeal also unreasonably violate[d] the Rules of Court because it does not support each point with citations to real (as opposed to fabricated) legal authority." (*Id.* at p. 447, citing rule 8.204(a)(1)(B).)  *Noland* sanctioned the attorney $10,000 payable to the court. (*Noland*, at p. 448.)

After *Noland*, Division One of the Fourth Appellate District addressed a similar issue in *Alvarez*.  There, in a written opposition to a motion to dismiss the appeal, a criminal defendant's attorney cited one nonexistent case and misrepresented the legal propositions in two other cases. (*Alvarez*, *supra*, 114 Cal.App.5th at pp. 1117-1118.)  Like the attorney in *Noland*, the attorney in *Alvarez* responded to the court's order to show cause by "admitting his 'lack of professionalism' for 'failing to verify cases provided to [him] by artificial intelligence.'" (*Alvarez*, at p. 1118.)  The attorney subsequently moved to withdraw from representation on the appeal. (*Ibid.*)  *Alvarez* sanctioned the attorney $1,500 payable to the court under subdivision (b)(2) of section 128.7 of the Code of Civil Procedure, finding the attorney's conduct "unprofessional." (*Alvarez*, at p. 1120.)  *Alvarez* agreed with the reasoning in *Noland* that "attorneys must check every citation to make sure the case exists and the citations are correct." (*Alvarez*, at p. 1119.)

III.      *Analysis*

Grotke's approach differs from those taken by the attorneys in *Noland* and *Alvarez*.  Grotke has not admitted that the Writ and the AOB contain hallucinated citations that were produced by generative AI.  Grotke admitted that he used AI in some fashion when preparing the AOB and that it was "possible" that he used AI in some

fashion when preparing the Writ. (38:35-38:45) But he maintains that the four spurious citations resulted from clerical error and that he intended to cite the actually existing cases for the propositions described in the declaration that he filed in response to our order to show cause. We find that Grotke's claims are not credible.

It is difficult to understand how Grotke's four spurious citations could possibly be mere clerical errors, and Grotke has not intelligibly explained how it would be possible. The spurious citations do not involve the mere omission or addition or transposition of one or several digits. Rather, all four spurious citations are completely different from the correct citations for the actually existing cases that have those case names. Grotke's spurious citations bear the hallmarks of hallucinated citations produced by generative AI. "'[H]allucinated cases look like real cases. They are identified by a case name, a citation to a reporter, the name of a district or appellate court, and the year of the decision. [Citation.] But, they are not real cases.'" (*Noland*, *supra*, 114 Cal.App.5th at p. 444.)

Grotke's claim that he intended to cite the actually existing cases is similarly lacking in credibility. The actually existing cases do not support the legal propositions for which Grotke provided the spurious citations in the Writ and the AOB. Consequently, it would make no sense for Grotke to claim that he intended to cite the actually existing cases to support those legal propositions. Grotke attempts to avoid that problem by claiming that he cited the four cases for various other legal propositions, which he describes in his declaration. But the attempt fails, because the legal propositions described in his declaration are not the legal propositions in the Writ and the AOB for which the spurious citations were provided as authority.

For all of these reasons, we conclude that Grotke's repeated claims that the spurious citations resulted from clerical errors unrelated to the use of generative AI are not credible.

Other parts of Grotke's response show a similar lack of candor and credibility. Grotke claimed in his declaration that the spurious citations "resulted from a breakdown in [his] citation-verification process during compilation from vLex." (Grotke Decl. ¶ 2.) But Grotke admitted at the hearing that before receiving our order of September 19, 2025, he had never signed up for or had a membership on vLex but merely used it "on and off" or "here and there." (45:13-45:19)

Insofar as Grotke claims that he did check the four cases—by searching for them either by case name or by volume and page number citation—before filing the Writ and the AOB, the claim is not credible. If Grotke had tried to check the cases by volume and page number citations, then he would have discovered that the cases do not exist. Grotke admits that is what happened when he searched for the cases in response to our order of September 19, 2025. (1:08:25-1:08:52; 1:10:44-1:10:58) And if Grotke had tried to check the cases by case names, then he would have discovered that the actually existing cases do not stand for the propositions for which he was citing them.

We agree with *Noland* and *Alvarez* that "attorneys must check every citation to make sure the case exists and the citations are correct. [Citation.] Attorneys should not

7

cite cases for legal propositions different from those contained in the cases cited. [Citation.] And attorneys cannot delegate this responsibility to any form of technology; this is the responsibility of a competent attorney." (*Alvarez*, *supra*, 114 Cal.App.4th at p. 1119; *Noland*, *supra*, 114 Cal.App.5th at pp. 446-447.) As explained by *Alvarez*, """[h]onesty in dealing with the courts is of paramount importance, and misleading a judge is, regardless of motives, a serious offense.""" (*Alvarez*, at p. 1119.)

For all of the foregoing reasons, we find that Grotke has failed to show cause why he should not be sanctioned for relying on fabricated legal authority in the Writ and the AOB. Grotke unreasonably violated rule 8.204(a)(1)(B) "by not support[ing] each point with citations to real (as opposed to fabricated) legal authority." (*Noland*, *supra*, 114 Cal.App.5th at p. 447; rule 8.276(a)(4).)

IV.     *Disposition*

For Grotke's unreasonable violation of rule 8.204(a)(1)(B), we issue a sanction in the amount of $1,750 to be paid by Grotke individually to the Fourth District Court of Appeal, Division Two within 30 days. (Rule 8.276(a)(4).)

We direct the Clerk of this court to notify the State Bar of the sanctions against Grotke. (Bus. & Prof. Code, § 6086.7, subd. (a)(3); rule 10.1017.)

CERTIFIED FOR PUBLICATION

MENETREZ _____
                                                                            J.

We concur:

FIELDS _____
              Acting P. J.

RAPHAEL _____
                              J.

cc:     See attached list

MAILING LIST FOR CASE: E083744
Mark Schlichter v. Gary Kennedy


Superior Court Clerk
San Bernardino County
8303 N. Haven Ave
Rancho Cucamonga, CA 91730


D. Scott Doonan
Law Offices of Doonan & Doonan, Inc.
627 W. Allen Avenue, Suite 200
San Dimas, CA 91773


Jeffrey D. Grotke
The Law Office of Jeff Grotke
22 North 6th Street, Suite C
Redlands, CA 92373